## In re JONASSON.

(District Court, D. Maryland. April 28, 1917.)

1. **ALIENS** ⊜ᵬ61—NATURALIZATION—PERSONS ENTITLED—ALIEN ENEMIES.

As bearing on the right to naturalization, a person born in Schleswig after its annexation by Prussia is a German subject and an alien enemy, though of Swedish and Danish descent.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 119–122.]

2. **ALIENS** ⊜ᵬ61—NATURALIZATION—PERSONS ENTITLED—ALIEN ENEMIES.

Rev. St. § 2171 (Comp. St. 1916, § 4362), first passed in 1802, provides that no subject of any country with which the United States is at war at the time of his application shall be admitted to citizenship. A further provision, adopted in 1813, authorized the naturalization during the continuance of the then war with Great Britain of persons who had made their declaration of intention before the breaking out of such war. When the law was adopted an oral application was made in open court and was then acted upon, but under the present law a petition must be filed on which the court may not act for at least 90 days. *Held*, that such petition is not the application contemplated by the statute, and an alien enemy may not be naturalized though his petition was filed prior to the declaration of war between his country and the United States.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 119–122.]

Application by Peter Christian Jonasson for naturalization. Petition denied.

ROSE, District Judge. [1] The applicant for naturalization was born in 1882 in Schleswig. He came into the world a German subject because as a sequel to the war of 1864 Prussia had annexed his birthplace. While his father was a Swede, his mother a Dane, and he in blood and sympathy is Scandinavian, not German, he is in law a subject of Wilhelm II, German Emperor, and as a legal consequence, since the 6th instant, an alien enemy.

[2] Does the law permit his naturalization? By an act first passed in 1802, c. 28, 2 Stat. 153, now forming part of section 2171 of the Revised Statutes (Comp. St. 1916, § 4362) Congress has declared that no alien who is a native, citizen, denizen, or subject of any country, state or sovereignty with which the United States shall be at war *at the time of his application, shall be then* admitted as a citizen of the United States. At that time and for 104 years thereafter, application for admission to citizenship was made orally in open court, and was then and there acted upon. The very statute now to be construed recognized this practice by requiring the applicant, at the time of his application to be admitted, to take the naturalization oath before the court. There can be no question as to what Congress in 1802 had in mind. It wished to forbid the naturalization of alien enemies.

In 1906 the naturalization procedure which had been followed for so many years was radically changed, and made far more formal. One who has previously declared his intention to become a citizen, and wishes to become one in fact, is now required to file in the clerk's office a somewhat elaborate petition which must be verified by his affida-

vit and that of two other persons. It may not be acted upon by the court until at least 90 days have elapsed. Is this petition the application within the meaning of the act of 1802, so that if the petitioner was then an alien friend he may be naturalized after war has been declared between his country and this? Within the last few days in the case of United States v. Meyer, the United States Circuit Court of Appeals for the Second Circuit has answered this query in the affirmative. That decision is not technically binding in this circuit, yet even though I find my own views to the contrary supported by the dissenting opinion of Judge Hough, it is only after great consideration that I can justify myself in declining to follow it. I have no doubt that what Congress, 115 years ago, wished to prevent was the naturalization of subjects of powers with which we were then at war. Under the practice then prevailing this end could be as well attained by saying that no one should be naturalized upon an application made in war time as it could be by the use of any other language. The act says, in effect, that no one who was an alien enemy at the time of his application shall be then admitted. The application and the admission are spoken of as simultaneous, as they in fact were then and for more than a century afterwards. The fact that in 1906 Congress saw fit to provide a more elaborate system of naturalization procedure does not even tend to show that it changed its mind as to the unwisdom of naturalizing alien enemies.

It is true that in 1813 Congress provided that persons who had made their declaration of intention before the breaking out of the then existing war with Great Britain might be naturalized during the continuance of that war. The Circuit Court of Appeals for the Second Circuit thought this indicated that the federal Legislature had altered its views as to the fundamental question of national policy involved. Is it not more in harmony with the ordinary rules of statutory construction to conclude that Congress merely wished, because of special circumstances then existing, to except that particular war from the rule which it still wished ordinarily to prevail?

Naturalization confers privileges and imposes obligations. Congress may have forbidden naturalization during war time of the subjects of our enemies because it did not think it altogether safe for us then to give them the rights of citizens. If such was its dominant purpose, it may be argued that all it wished to do was to make sure that no alien enemy should become a citizen unless he had sought that privilege before he could see that we would speedily be at war with the land of his nativity. If so, it may be said that the important date would be that upon which he asked for his final papers, rather than that upon which the court granted them. Even so, it may be answered that an alien does not become a citizen until he takes the naturalization oath. Before his status is thus definitely changed he is at liberty at any time to abandon the prosecution of his petition. Until that moment, whether he shall or shall not go any further with it is absolutely within his control. Among the petitions assigned for hearing on the same day with that now under consideration, was one of an educated gentleman, a clergyman of the Roman Catholic Church. He is a German subject.

He declined to prosecute his case because he had learned that under the German law he would lose, not only any property he now has in that Empire, but all capacity ever to inherit any there. In refusing to go further he was absolutely within his rights. After the 3d of February, 1917, when we broke off diplomatic relations with Germany, war was obviously probable. Any one who, for any improper purpose, wished in the event of war to be clothed with the privileges of American citizenship could then have filed his petition and have prosecuted it or refrained from so doing as subsequent events dictated.

But Congress may have been inspired by still other motives. In view of certain principles of international law then and now generally accepted, it may have been unwilling to permit an alien enemy during time of war to assume the obligations of a citizen. As the late Mr. Justice Miller pointed out, an alien born remains an alien until he has been completely naturalized, even although he has resided in this country many years, declared his intention to become a citizen, and voted, when the state Constitution permitted those in his situation so to do. Lanz v. Randall, 14 Fed. Cas. 131.

Although in the Draft Act of March 3, 1863, such persons were declared liable to compulsory service, President Lincoln felt constrained to give them 65 days to leave the country, if they were unwilling to serve. Wheaton's International Law, 248.

After an alien takes the final oath of naturalization he becomes liable to all the burdens of citizenship. He may be drafted into our armies. If he is, what will be his status if captured by the forces of his former sovereign. Prior to 1802, and for many years afterwards, courts and text-writers, as well those of this as other countries, questioned or denied the right of any man to change his allegiance of nativity, without consent of his sovereign. The Court of King's Bench, as late as 1903, unanimously decided that any one whò after war breaks out between his country and another becomes naturalized in the latter, can, if captured by his former sovereign, be lawfully tried and punished as a traitor. He could not change his allegiance after the outbreak of war. Rex v. Lynch, Law Reports, First King's Bench 1903, 444. And that decision was made in the face of the fact that the statute law of the United Kingdom permitted a British subject to be naturalized abroad. The court said that such enactments were intended to apply only when the country of his birth and that of his choice were at peace. May not Congress have intended to make sure that no alien born should be placed in any such position? The unwillingness to permit him to change during war time from an alien to a citizen may rest on other grounds than mere tenderness for him. His former sovereign might believe himself justified in treating him as a traitor. We having admitted him to our citizenship might feel in honor bound to protect him as if he had been native born. How could we do so except by those retaliations which provoke an ever-widening circle of barbarous reprisals. Congress may have wished to make sure that no such situation would arise.

What is certain is that in 1802 it in practical effect forbade the naturalization of an alien enemy in war time. There is no reason to sup-

pose that when in 1906 it altered the naturalization procedure it had in mind any change in this century-old policy.

Having come to this conclusion I would not be justified in admitting the applicant to citizenship. In particular cases this construction will be embarrassing to individuals and perhaps to classes. One of the applicants for naturalization here to-day is a Pole in blood and feeling. He passionately denies that he is a German. When he was asked whether he had not been born in Posen and was not in consequence a subject of the German Empire, he answered: "Posen does not belong to Germany. Prussia stole it." It is to be hoped that either by a decision of the Supreme Court or a declaratory act of Congress all room for difference of opinion as to the proper construction of section 2171 will speedily be removed.

The order of the court will be that the hearing of the applicant's petition for naturalization be not now proceeded with, unless he wishes to appeal, in which latter event an order refusing to naturalize will be entered.